**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: AIR CRASH DISASTER OVER MAKASSAR STRAIT, SULAWESI | Master Docket No. 09-CV-3805<br>MDL No. 2037<br><br>The Honorable Marvin E. Aspen<br><br>This Filing relates to:  ALL CASES |

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS ON THE GROUNDS OF *FORUM NON CONVENIENS***

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................................1

II.   BACKGROUND ...............................................................................................4

      A.    The Accident and the Indonesian Investigation ....................................4

      B.    The Releases .......................................................................................6

      C.    The Indonesian Government's Response to the Accident and the Results
            of the KNKT Investigation. .................................................................7

      D.    Plaintiffs' Allegations ..........................................................................8

III.  ARGUMENT ..................................................................................................10

      A.    Indonesia Is an Available and Adequate Alternative Forum...............10

            1.    Indonesia Is an Available Forum. ............................................11

            2.    Indonesia Is an Adequate Forum. ............................................11

      B.    The Private Interest Factors Strongly Favor Dismissal. .....................13

            1.    The Location of Sources of Proof Factor Favors Indonesia. ....13

                  a.    Critical Liability Evidence is in Indonesia. ...................13

                  b.    Damages Evidence is in Indonesia. ..............................15

                  c.    Evidence Related to the Releases is in Indonesia..........17

            2.    Critical Witnesses and Documents Are Beyond the Reach of
                  Compulsory Process. ..............................................................18

            3.    The Inability to Join Adam Air in the U.S. Favors Dismissal.................20

      C.    The Public Interest Factors Also Strongly Favor Dismissal................21

            1.    Indonesia Has an Overwhelming Interest in Deciding This Dispute,
                  Far Outweighing the Interest of Any Possible U.S. Forum....................21

            2.    There Is No Reason to Burden Any U.S. Court with Resolving
                  Litigation in Which Indonesia Has Such a Significant and
                  Overwhelming Interest ..........................................................24

            3.    These Cases Would Proceed to Trial Nearly Three Times Faster in
                  Indonesia Than in the U.S .....................................................25

            4.    Dismissal Would Avoid Unnecessary Conflict of Laws Problems
                  and the Necessity of Applying Indonesian Law ........................25

IV.   CONCLUSION ...............................................................................................26

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abad v. Bayer Corp.*,
    563 F.3d 663 (7th Cir. 2009) ....................................................................... 10, 18

*Alexander Proudfoot, Plc v. Fed. Ins. Co.*,
    860 F. Supp. 541 (N.D. Ill. 1994) ....................................................................... 19

*Baumgart v. Fairchild Aircraft Corp*,
    981 F.2d 824 (5th Cir. 1993) ............................................................................... 15

*Baumgart v. Fairchild Aircraft Corp.*,
    No. 90-818, 1991 WL 487242 (W.D. Tex. Sept. 30, 1991) ................................. 24

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ............................................................................................ 20

*Carney v. Singapore Airlines*,
    940 F. Supp. 1496 (D. Ariz. 1996) ................................................................. 10, 18

*Chang v. Baxter Healthcare Corp.*,
    No. 09-2280, 2010 WL 1136521 (7th Cir. Mar. 26, 2010) ..........................passim

*Chhawchharia v. Boeing Co.*,
    657 F. Supp. 1157 (S.D.N.Y. 1982) ............................................................... 19, 21

*Clerides v. Boeing Co.*,
    534 F.3d 623 (7th Cir. 2008) ........................................................................passim

*Da Rocha v. Bell Helicopter Textron, Inc.*,
    451 F. Supp. 2d 1318 (S.D. Fla. 2006) ................................................ 2, 15, 18, 19

*Dalrymple v. Fairchild Aircraft Inc.*,
    575 F. Supp. 2d 790 (S.D. Tex. 2008) ................................................................. 26

*Damigos v. Flanders Compania Naviera S.A.-Panama*,
    716 F. Supp. 104 (S.D.N.Y. 1989) ..................................................... 18, 21, 25

*DeAguilar v. Boeing Co.*,
    11 F.3d 55 (5th Cir. 1993) ..................................................................................... 1

*Esheva v. Siberia Airlines*,
    499 F. Supp. 2d 493 (S.D.N.Y. 2007) ...................................................... 1, 21, 22

*Fredriksson v. Sikorsky Aircraft Corp., Inc.*,
    No. 3:08CV450, 2009 WL 2952225 (D. Conn. Sept. 2, 2009) ................... 1, 15, 26

**TABLE OF AUTHORITIES**

(continued)

**Page**

*Gambra v. Int'l Lease Fin. Corp.*,
    377 F. Supp. 2d 810 (C.D. Cal. 2005) ..................................................2, 19, 21, 23

*Geier v. Omniglow Corp.*,
    No. 08-4032, 2009 WL 4893668 (2d Cir. Dec. 21, 2009) .....................................25

*Gonzales v. P.T. Pelangi Niagra Mitra Int'l*,
    196 F. Supp. 2d 482 (S.D. Tex. 2002) ..................................................................10

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947) ....................................................................................passim

*Hull 753 Corp. v. Elbe Flugzeugwerke GmbH*,
    58 F. Supp. 2d 925 (N.D. Ill. 1999) ......................................................................12

*In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001*,
    No. MDL 1448, 2006 WL 1288298 (S.D.N.Y. May 9, 2006) ................................25

*In re Air Crash Disaster Near Bombay, India on Jan. 1, 1978*,
    531 F. Supp. 1175 (W.D. Wash. 1982) .................................................................26

*In re Air Crash Disaster Near Peggy's Cove, Nova Scotia on Sept. 2, 1998*,
    210 F. Supp. 2d 570 (E.D. Pa. 2002) ...................................................................26

*In re Air Crash Near Athens, Greece on August 14, 2005*,
    479 F. Supp. 2d 792 (N.D. Ill. 2007) ...............................................................passim

*In re Air Crash Near Peixoto De Azeveda, Brazil, on September 29, 2006*,
    574 F. Supp. 2d 2729 (E.D.N.Y. 2009) ...................................................21, 22, 24

*In re Air Crash Over Taiwan Straits on May 25, 2002*,
    331 F. Supp. 2d 1176 (C.D. Cal. 2004) ..................................................2, 16, 21, 22

*In re Bridgestone/Firestone, Inc.*,
    420 F.3d 702 (7th Cir. 2005) .................................................................10, 16, 21

*In re Factor VIII or IX Concentrate Blood Prods. Liab. Litig.*,
    408 F. Supp. 2d 569 (N.D. Ill. 2006), *aff'd* 484 F.3d 951 (7th Cir. 2007) .........22, 24

*In re Factor VIII or IX Concentrate Blood Prods. Litig.*,
    484 F.3d 951 (7th Cir. 2007) ...............................................................11, 20, 25

*In re Factor VIII or IX Concentrate Blood Products Litigation*,
    531 F. Supp. 2d 957 (N.D. Ill. 2008) ...................................................18, 20, 23, 24

*Kamel v. Hill-Rom Co.*,
    108 F.3d 799 (7th Cir. 1997) .............................................................................passim

-iii-

# TABLE OF AUTHORITIES
(continued)

Page

*Kryvicky v. Scandinavian Airlines Sys.*,
807 F.2d 514 (6th Cir. 1986) ........................................................................... 1

*Lampitt v. Beech Aircraft Corp.*,
No. 81 C 5406, 1982 U.S. Dist. LEXIS 12677 (N.D. Ill. May 4, 1982) (Aspen, J.) ............... 15

*Lauritzen v. Larsen*,
345 U.S. 571 (1953) ....................................................................................... 26

*Lleras v. Excelaire Svcs. Inc.*,
No. 08-3823-cv, 2009 WL 4282112 (2d Cir. Dec. 2, 2009) ................................. 1, 21

*Loya v. Starwood Hotels & Resorts Worldwide, Inc.*,
583 F.3d 656 (9th Cir. 2009) .......................................................................... 25

*Lueck v. Sundstrand Corp.*,
236 F.3d 1137 (9th Cir. 2001) ......................................................... 1, 16, 19, 24

*Macedo v. Boeing Co.*,
693 F.2d 683 (7th Cir. 1982) .......................................................................... 24

*Martin v. Vogler*,
No. 93 C 3870, 1993 WL 462853 (N.D. Ill. Nov. 9, 1993) (Aspen, J.) ...................... 25

*Melgares v. Sikorsky Aircraft Corp.*,
613 F. Supp. 2d 231 (D. Conn. 2009) ............................................................ 1, 15

*Mercier v. Sheraton Int'l, Inc.*,
981 F.2d 1345 (1st Cir. 1992) ....................................................................... 11, 12

*Navarrete De Pedrero v. Schweizer Aircraft Corp.*,
635 F. Supp. 2d 251 (W.D.N.Y. 2009) ............................................................ 1, 18

*Nolan v. Boeing Co.*,
762 F. Supp. 680 (E.D. La. 1989), *aff'd*, 919 F.2d 1058 (5th Cir. 1990) .................. 24

*Paolicelli v. Ford Motor Co.*,
289 F. App'x 387 (11th Cir. 2008) .................................................................... 18

*Piper Aircraft Co. v. Reyno*,
454 U.S. 235 (1981) ................................................................................. passim

*PT United Can v. Crown Cork & Seal Co.*,
138 F.3d 65 (2d Cir. 1998) ............................................................................ 12

*Quaak v. KPMG Bedrijfsrevisoren*,
361 F.3d 11 (1st Cir. 2004) ............................................................................ 19

-iv-

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Reers v. Deutsche Bahn AG,*
320 F. Supp. 2d 140 (S.D.N.Y. 2004) ...................................................................21

*Satz v. McDonnell Douglas Corp.,*
244 F.3d 1279 (11th Cir. 2001) ....................................................................... 1, 26

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,*
549 U.S. 422 (2007) ...............................................................................................10

*Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund,*
589 F.3d 417 (7th Cir. 2009) ............................................................................17, 26

*Tazoe v. Aereas,*
No. 07-21941-CIV, 2009 WL 3232908 (S.D. Fla. Aug. 24, 2009) ....................15, 19

*Van Schijndel v. Boeing Co.,*
434 F. Supp. 2d 766 (C.D. Cal. 2006), *aff'd* 263 F. App'x 555 (9th Cir. 2008) ...............passim

*Vorbiev v. McDonnell Douglas Helicopters, Inc.,*
No. C 08-05539, 2009 WL 1765675 (N.D. Cal. June 18, 2009) .................................1

*Wong v. Partygaming Ltd.,*
589 F.3d 821 (6th Cir. 2009) ................................................................................11

*Zipfel v. Halliburton Co.,*
832 F.2d 1477 (9th Cir. 1987), *amended on other grounds*, 861 F.2d 565 (9th Cir. 1988)...............................................................................................................10

**Statutes**

46 U.S.C. § 30302 ..................................................................................................15, 26

46 U.S.C. § 30307(b).....................................................................................................26

**Regulations and Rules**

Fed. R. Civ. P. 19 .............................................................................................................3

Fed. R. Civ. P. 19(c) ........................................................................................................3

01038-5237/LEGAL17674197.18

## I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendants[1] move to dismiss these cases on the ground of *forum non conveniens* ("FNC") in favor of Indonesia.  These actions arise out of the crash of Adam Air Flight DHI-574 ("Flight 574") off the island of Sulawesi, Indonesia on January 1, 2007 ("the Accident").  The Accident occurred on a domestic Indonesian flight conducted by an Indonesian airline regulated by Indonesian authorities.  The Indonesian government conducted the official investigation of the Accident and it found that Adam Air's maintenance supervision and oversight were ineffective at addressing a problem with the aircraft's inertial reference system (the "IRS," which computes aircraft position, ground speed and attitude data for the aircraft's flight systems) and that mistakes made by Adam Air's pilots while troubleshooting this problem caused the Accident.  (Dodt Ex. A at 41, 57-58.)  Now the Indonesian representatives of the estates of 52 Indonesian passengers and crew who died in the Accident bring suit in the U.S.  Although the majority of them previously released and assigned their claims to Adam Air, Plaintiffs seek damages on behalf of over 100 beneficiaries, all of whom are Indonesian citizens and all but two of whom reside in Indonesia.  These cases, however, belong in Indonesia.

This case is controlled by *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981), in which the U.S. Supreme Court used the FNC analysis to approve dismissal of claims brought by foreign plaintiffs against U.S. manufacturers arising from a foreign aviation accident.  Since *Piper Aircraft*, federal courts have consistently exercised their authority to dismiss such claims, as well as claims involving foreign settlements, as exemplified by the Seventh Circuit's recent FNC decisions in *Clerides v. Boeing Co.*, 534 F.3d 623 (7th Cir. 2008) and *Chang v. Baxter Healthcare Corp.*, No. 09-2280, 2010 WL 1136521 (7th Cir. Mar. 26, 2010).[2]

---

[1] Defendants reserve all their rights, and by filing this motion do not waive any rights to contest personal jurisdiction or to assert any such other defense as may be available.

[2] *See also Lleras v. Excelaire Svcs. Inc.,* No. 08-3823-cv, 2009 WL 4282112 (2d Cir. Dec. 2, 2009); *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279 (11th Cir. 2001); *Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001); *DeAguilar v. Boeing Co.*, 11 F.3d 55, 58-59 (5th Cir. 1993); *Kryvicky v. Scandinavian Airlines Sys.*, 807 F.2d 514 (6th Cir. 1986); *Fredriksson v. Sikorsky Aircraft Corp., Inc.*, No. 3:08CV450, 2009 WL 2952225 (D. Conn. Sept. 2, 2009); *Vorbiev v. McDonnell Douglas Helicopters, Inc.*, No. C 08-05539, 2009 WL 1765675 (N.D. Cal. June 18, 2009); *Navarrete De Pedrero v. Schweizer Aircraft Corp.*, 635 F. Supp. 2d 251 (W.D.N.Y. 2009); *Melgares v. Sikorsky Aircraft Corp.*, 613 F. Supp. 2d 231 (D. Conn. 2009); *Esheva v. Siberia Airlines*, 499 F. Supp. 2d 493 (S.D.N.Y. 2007); *Da Rocha v.*

At the outset of the FNC inquiry, the Court must determine whether there is an adequate and available alternative forum in which to try these cases. Indonesia is both adequate and available. The Indonesian courts have experience in cases involving large air crashes, and trials of such cases are typically completed within six to nine months of filing. Indeed, the Central District Court of Jakarta is presently hearing a series of wrongful death cases filed against Boeing that arise out of the crash of another Indonesian aircraft. Those cases were consolidated in this District before Judge Grady, but then dismissed through stipulated FNC dismissals executed by the same counsel who represent Plaintiffs in this case. (Kendrick ¶ 15 & Ex. F.)

The Court must also balance the FNC private and public interest factors. Here, the private interest factors heavily favor dismissal. Critical liability and damages evidence is located in Indonesia, including the witnesses and records relating to Adam Air and its employees, the Indonesian government's investigation, and Plaintiffs' economic and non-economic losses. Much Indonesian evidence is held by third parties beyond the compulsory process of this Court. A critical party, Adam Air, cannot be joined as a defendant or made to respond to discovery here. In contrast, most relevant U.S. evidence is in the possession of Defendants, who agree to produce any such evidence deemed relevant in Indonesia should cases be re-filed there.

The public interest factors also overwhelmingly favor the Indonesian forum. Indonesia has a compelling interest in an aircraft disaster involving an Indonesian airline and Indonesian passengers that was investigated by Indonesian authorities. This Accident and other recent Indonesian accidents prompted a comprehensive review of the safety of Indonesian airlines and the restructuring of Indonesia's aviation safety regulations. As a result, the Indonesian public, government, and press have a profound, continuing interest in the issues raised in this litigation.

While this case is similar to many other cases that have been dismissed for FNC, there are several additional factors that make this an even more compelling case for dismissal. First, FNC dismissal is especially warranted here because representatives of 46 of the 52 decedents

---

*Bell Helicopter Textron, Inc.*, 451 F. Supp. 2d 1318 (S.D. Fla. 2006); *Van Schijndel v. Boeing Co.*, 434 F. Supp. 2d 766 (C.D. Cal. 2006) (9th Cir. 2008); *Gambra v. Int'l Lease Fin. Corp.*, 377 F. Supp. 2d 810, 827 (C.D. Cal. 2005); *In re Air Crash Over Taiwan Straits on May 25, 2002*, 331 F. Supp. 2d 1176 (C.D. Cal. 2004).

-2-

named herein previously accepted compensation and relinquished their claims in full in Indonesia. It is undisputed that the representatives executed written agreements ("the Releases"), signed in Indonesia, in which they (1) expressly released their claims not only against Adam Air, whose representatives negotiated the releases, but also against all of the Defendants in this action, and (2) alternatively assigned to Adam Air any claims they had arising out of the Accident. Plaintiffs contend that, at the outset, the Court must determine "whether the individual signing the release had the power to do so." (Dkt. No. 30 at 2.)[3] They also "intend on showing" that these releases are "void" because of some type of duress or unconscionable conduct. (*Id.*) Accordingly, a key threshold issue that must be addressed before the merits of Plaintiffs' claim is whether the releasing parties have any standing to bring claims at all – either because they relinquished them by release or by assignment to Adam Air.

This is purely a matter of Indonesian law for the Indonesian courts to decide because the Releases themselves require that any such disputes regarding the Releases' terms be heard in an Indonesian court and decided under Indonesian law. Further, all the evidence relevant to this dispute is in Indonesia, including the relevant witnesses and documents relating to the negotiation and execution of the Releases, the proper beneficiaries of the decedents, the execution of the Releases, and the payment of funds. Indonesia also has a strong public interest in determining the validity of releases and assignments executed between Indonesian citizens and an Indonesian airline. Indeed, to the extent that Plaintiffs claim that the Releases are void in their entirety or the court is called on to decide whether the assignments to Adam Air are valid, Adam Air would be a necessary and indispensable party. *See* Fed. R. Civ. P. 19. If Plaintiffs truly intend to proceed as they suggest, they should have already pled why Adam Air was not named. *See* Fed. R. Civ. P. 19(c). Of course, doing so would only have highlighted the inappropriateness of any U.S. forum. Nonetheless, Plaintiffs cannot avoid the conclusion that Indonesia is the only appropriate and convenient forum in which to resolve the issues related to the Releases, which are potentially dispositive of most of these claims.

---

[3] Copies or excerpts of all pleadings cited herein are attached as Exhibits O-X to the Declaration of Allison Kendrick, filed herewith.

Second, unlike many cases where plaintiffs in U.S. litigation claim that a product defect was the sole cause of the accident, here Plaintiffs expressly implicate Adam Air's conduct as a causal factor by alleging in their negligent entrustment claims that Adam Air "did not have properly trained pilots and crew, did not have properly qualified and trained maintenance personnel, and did not have an adequate maintenance program." (*E.g.*, Dkt. No. 32 at 94.)[4] Evidence relating to these allegations is in Indonesia.

Third, dismissal is warranted because Plaintiffs have effectively conceded that it is not convenient to litigate these claims far from their homes in Indonesia. They have, in fact, gone on record as asserting "that it would be ***unwieldy and cumbersome***" for the plaintiffs to "travel from overseas" to participate in these lawsuits. (Dkt. No. 57 (emphasis added).)

Given these three additional factors, this case presents an even stronger case for FNC dismissal than *Piper Aircraft* and its progeny. The Release issues, standing alone, tip the balance of the private and public interest factors in favor of Indonesia. To facilitate resolution of these cases in a far more convenient Indonesian forum, Defendants will agree to (1) consent to an Indonesian court's jurisdiction in actions re-filed by these Plaintiffs; (2) toll any statute of limitations that might apply to such re-filed claims for 120 days after dismissal by this Court; (3) make available in actions re-filed by these Plaintiffs in the courts of Indonesia any evidence or witnesses in their possession, custody, or control in the United States that an Indonesian court determines are relevant; and (4) subject to the right of appeal, pay or cause to be paid any final judgment awarded against Defendants by an Indonesian court in such re-filed actions.

## II.     BACKGROUND

### A.     The Accident and the Indonesian Investigation.

On January 1, 2007, Adam Air Flight 574 crashed while flying within Indonesia from Surabaya on the island of Java to Manado on the island of Sulawesi. The 96 passengers and 6 crew members on the aircraft were killed. Except for three passengers who are not part of these cases, all on board the aircraft appear to have been Indonesian citizens and residents. (Kendrick

---

[4] Defendants are in no way admitting that these Plaintiffs have adequately stated a claim for negligent entrustment.

-4-

Ex. L.)  The aircraft wreckage was located in the high seas off the coast of Sulawesi.

Adam Air was a licensed domestic Indonesian airline approved by the Indonesian Directorate General Civil Aviation ("DGCA") to operate the subject aircraft at the time of the Accident.  (Report at 35-36.)  Adam Air never operated flights to or from the United States.  The Accident aircraft was a Boeing 737-4Q8 that was delivered to its first owner in 1989, almost eighteen years before the Accident.  (Dodt ¶ 5.)  Over the years, the Accident aircraft was sold and was operated by a number of different airlines.  (Dodt Ex. A at 13.)  The aircraft was leased to Adam Air in 2005, and was inspected and certified as airworthy by the DGCA.  (*Id.* at 13, 36.)  Because Adam Air operated exclusively in Indonesia, that is where its records and employees are believed to be located.  (*Id.* at 35; Dodt ¶¶ 17-19.)  After the accident, Adam Air ceased operations and it no longer has an airline operating certificate.  The company is currently in bankruptcy in Jakarta, Indonesia.  (Ganie ¶ 45.)

Indonesia's National Transportation Safety Committee (or "KNKT" in Indonesian) was responsible for the official investigation of the Accident and published a final report documenting its findings, conclusions, and recommendations (the "KNKT Report" or, simply, the "Report").  During its investigation, the KNKT recovered limited wreckage from the Accident site, including the cockpit voice recorder ("CVR") and digital flight data recorder ("DFDR").[5]  During its investigation, the KNKT examined data from the CVR and DFDR, interviewed Adam Air maintenance and pilot personnel, reviewed maintenance records, meteorological information, aircraft, engine, and radar data, and consulted investigators from the Australian Transport Safety Bureau as well as the U.S. National Transportation Safety Board ("NTSB").  (Dodt ¶ 10 & Ex. A at 1-49.)

According to the KNKT, the pilots experienced a malfunction of the aircraft's Inertial Reference System ("IRS") during the flight, and although "the pilots were appropriately licensed and qualified to operate" the subject aircraft, they "did not have sufficient knowledge of the aircraft system to quickly and appropriately troubleshoot the IRS problem they were facing."

---

[5] Much of the airplane's wreckage was not recovered from the waters off Sulawesi because it rested in a deep underwater channel that made recovery efforts unfeasible.

(Dodt Ex. A at 55.)  The KNKT reported that for a three month period before the Accident, the airline's maintenance organization failed to follow proper procedures to repair recurring complaints with the IRS.  (*Id.* at 56-57.)  The KNKT found that on the accident flight the pilots became "engrossed" in troubleshooting the IRS for the last 13 minutes of flight with "minimal regard to other flight requirements."  (*Id.* at 1.)  While troubleshooting the IRS, the pilots took action that disengaged the autopilot function and then they silenced the autopilot disengage horn.  (*Id.* at 24.)  Notwithstanding the obvious disengagement of the autopilot, the pilots failed to take control of the aircraft or monitor available flight instruments to ensure a stable and controlled flight path.  With no one flying the aircraft, it began a slow bank to the right and an aural alert, recorded on the CVR, sounded "BANK ANGLE, BANK ANGLE, BANK ANGLE, BANK ANGLE" when the aircraft reached a 35-degree right bank.  (*Id.* at 2, 51.)  The pilots failed to take timely and appropriate corrective action in response to this warning and the airplane continued to roll to the right and into a nose down attitude.  Even when the pilots finally realized their critical situation, they used insufficient or improper recovery efforts and lost control of the aircraft.  (*Id.* at 56.)

**B.    The Releases.**

After the Accident, Adam Air settled the claims of, and obtained releases from, the legal heirs of all 46 passenger decedents in these cases.[6]  (Kendrick ¶ 3.)  In exchange for substantial compensation, the legal heirs of the decedents agreed to release each and every entity that might be responsible for the Accident, including Defendants.[7]  (*Id.*)  In all cases, the compensation that Adam Air paid was at least 20 times the statutory damages cap under Indonesian law.  (*Id.*)

The Releases include the following material terms:

- **Release.**  The legal heir who signed each Release agreed to "*release[], discharge[], and forever renounce[] any claim for damages or compensation of any kind whatsoever which the Releasor has or may have arising out of or in any way related to the Accident.*" (Kendrick Ex. A ¶ 2 (emphasis added).)  The legal heirs or "Releasors" released their claims against Adam Air, as well as "The Boeing Company …, Honeywell International

---

[6] Adam Air did not obtain releases from the Plaintiffs who are suing on behalf of the six crew members.

[7] Adam Air did not obtain releases from the seven Plaintiffs who are not legal heirs of their decedents. According to Releases for those decedents, however, their actual legal heirs did execute Releases. (Kendrick ¶ 3.)

Inc. …, World Star Aviation, Ltd.,[8] Wells Fargo Bank Northwest, N.A., Triton Aviation Finance, Triton Aviation International LLC, Triton Aviation Investments LLC … any and all of their past, present, and future … agents, servants, representatives, employees, subsidiaries, parent companies, affiliates … and any other persons or business entities who are or may be alleged to be responsible for any liability arising from the Accident." (*Id.* ¶ 1.)  Each of these entities is named as a "Releasee."  (*Id.*)

- **Assignment.**  All Releasors also assigned and transferred "all of their rights of claim against any parties arising out of the Accident to Adam Air, its insurers and reinsurers who are subrogated to such rights."  (*Id.* ¶ 5.)

- **Indonesian Law.**  Each Releasor agreed to a choice-of-law clause stating that the "interpretation and implementation" of the Releases "shall be governed by and subject to the applicable laws of the Republic of Indonesia."  (*Id.* ¶ 8.)

- **Indonesian Forum.**  Each Releasor agreed to a forum selection clause specifying that "[s]ettlement of any disputes arising out of … [the Release] shall be resolved through a District Court in the Republic of Indonesia."  (*Id.* ¶ 9.)

All Releases were executed in Indonesia before an independent Indonesian notary and two witnesses.  Every Release states that the Releasors either read the Release or had it read and explained to them, and that the Releasors "fully understand all the terms herein."  *See id.* ¶ 14. The Releases were executed concurrently in English and the Indonesian language.  *Id.* ¶ 13.

### C.  The Indonesian Government's Response to the Accident and the Results of the KNKT Investigation.

Following the Accident, the Indonesian government took a number of steps to enhance the Indonesian aviation safety infrastructure.  These measures include:

- Ten days after the Accident, the President of Indonesia formed a committee called the National Transportation Safety and Security Evaluation Team (or "EKKT" in Indonesian) that was tasked with evaluating the Indonesian transportation infrastructure and implementing policies for improving civil aviation safety and security.  (Ganie ¶ 84.) Recommendations have been made and are being implemented.  (*Id.*)

- The Indonesian government signed a joint agreement with the International Civil Aviation Organization ("ICAO") to improve civil aviation safety in the country and has taken steps to do so.  (Kendrick Ex. H.)

- Indonesia's DGCA has ordered that all Indonesian flight crews and maintenance personnel receive additional training, that operators have current versions of aircraft

---

[8] "World Star Aviation, Ltd.," listed in 23 of the Releases, presumably refers to Defendant World Star Aviation Services, Inc., incorrectly sued here as World Star Aviation Services, Ltd.

manuals, and that maintenance personnel address maintenance issues promptly and be properly certified. (Dodt Ex. A at 59-60.)

- The Indonesian Ministry of Transportation audited and ranked the safety of all Indonesian airlines, revoked and/or suspended the Air Operator's Certificate of poorly performing Indonesian airlines, and required low-rated airlines to make safety improvements. (Ganie ¶ 85; Kendrick Ex. I at 1.)

- The Indonesian government has provided support for Indonesian airlines who were, en masse, banned from flying in European Union airspace. With this help, four Indonesian airlines have been removed from the European Union's "blacklist." (Ganie ¶ 86; Kendrick Exs. L-M.)

These steps demonstrate the Indonesian government's interest in aviation and the role this Accident played in its enhancement. Commercial aviation is essential to Indonesia's transportation system. The country spans 17,500 islands spread over 1.2 million square miles and its citizens depend on air travel as the most efficient means of transportation. (Ganie ¶ 88.) The Indonesian airline industry has rapidly expanded in recent years to accommodate this need and its safety and reliability is of great interest to the Indonesian public. *Id.* The Indonesian economy heavily depends on tourism, and that industry is negatively affected by highly publicized air crashes such as this one. (Ganie ¶¶ 89-90.) Following multiple aviation accidents in recent years, the Indonesian public and press have demonstrated an enduring interest in their government's efforts to improve civil aviation safety. (Ganie ¶ 90; Kendrick Exs. I-K.)

**D.      Plaintiffs' Allegations.**

Two of these consolidated cases (*Wuisan* and *Sumini*) were originally filed in Illinois state court and removed to this Court. The remaining case (*Lendo*) was originally filed California state court, removed to federal court, and transferred here by the Judicial Panel on Multidistrict Litigation for consolidation with the Illinois actions. In the consolidated cases, 32 Plaintiffs sue on behalf of 52 decedents – 46 passengers and six crew members from Flight 574. Plaintiffs seek damages for significantly more than 100 beneficiaries.[9]

---

[9] Plaintiffs representing 27 decedents – more than half – either did not respond to discovery at all or objected to providing the number of beneficiaries they claim are entitled to damages. (Kendrick ¶ 5.) However, Plaintiffs who did respond identify more than 100 beneficiaries. (*Id.* ¶ 8.) Accordingly, the number of potential beneficiaries will undoubtedly exceed 100 by a substantial margin.

-8-

In their consolidated amended complaint (Dkt. No. 32), Plaintiffs direct strict products liability, negligence, and negligent entrustment allegations variously against (1) The Boeing Company ("Boeing") as the manufacturer of the aircraft (Dkt. No. 32 at ¶ 4); (2) Honeywell International Inc. ("Honeywell") as the manufacturer of the IRS (*id.* ¶¶ 22-24); (3) World Star Aviation Services ("World Star") as an alleged manager/maintenance provider of the aircraft (*id.* ¶¶ 9-11), though it had no such relationship with the aircraft as noted in support of its personal jurisdiction objection (Dkt. No. 42-1 at ¶¶ 17-27); and (4) Triton Aviation Business Services Holdings, LLC ("TABS"), Triton Aviation Ltd. ("TAL"), Wells Fargo & Co. ("Wells Fargo & Co.") and Wells Fargo Bank Northwest, N.A. ("Wells Fargo Bank") as owners and lessors of the aircraft (Dkt. No. 32 at ¶¶ 16, 18, 20), though TABS, TAL and Wells Fargo & Co. did not own or lease the subject aircraft and Wells Fargo Bank acted solely in its capacity as owner-trustee of the subject aircraft. (Dkt. No. 41 at ¶ 18, Count XV ¶ 39).

Plaintiffs' allegations are summarized as follows:

- The aircraft had various defects in its design, including the design of the IRS. In support of this allegation, Plaintiffs specifically assert that while operated by Adam Air, the Accident aircraft experienced repetitive problems with the IRS that were not fixed before the Accident. (Dkt. No. 32 at 11.)

- Manuals published by Boeing failed to provide sufficient guidance and training material for the Adam Air pilots regarding the IRS. (*Id.* at 12)

- World Star maintained the Accident aircraft for Adam Air and negligently failed to maintain the aircraft and to correct the IRS problems. (*Id.* at 12, 52.)

- World Star, TABS, TAL, Wells Fargo & Co. and Wells Fargo Bank (alleged to have delivered, leased, and/or owned the Accident aircraft) negligently entrusted the Accident airplane to Adam Air, and those Defendants knew or should have known "that Adam Air did not have properly trained pilots and crew, did not have properly trained maintenance personnel, and did not have an adequate maintenance program." (*Id.* at 78, 86, 103, 137.)

Although directed at Defendants, Plaintiffs' allegations, notably their claim that Adam Air did not have properly trained personnel or an adequate maintenance program for the Accident airplane, relate directly to Adam Air's operations in Indonesia. Likewise, Boeing and Honeywell have put the conduct of Adam Air and its personnel at issue as the proximate cause of the Accident. (Dkt. No. 49 at 33 (Honeywell's 9th Aff. Def.); Dkt. No. 44 at 36-37 (Boeing's

-9-

4th and 5th Defs.).)  Adam Air is not a defendant in this action, and no party appears to dispute that Adam Air lacks sufficient contacts with the forum to be brought into these cases.

### III.    ARGUMENT

Convenience is the mainstay of the doctrine of *forum non conveniens*.  *Clerides*, 534 F.3d at 627-28 (citing *In re Bridgestone/Firestone, Inc.*, 420 F.3d 702, 703 (7th Cir. 2005)).  Dismissal on the grounds of FNC is appropriate if (1) there is an adequate and available alternative forum in which the case may be tried, and (2) the private and public interest considerations favor dismissal.  *Kamel v. Hill-Rom Co.*, 108 F.3d 799 (7th Cir. 1997).

In an FNC analysis, a foreign plaintiff's choice of a U.S. forum is not given the same deference afforded to U.S. residents.  *Chang*, 2010 WL 1136521, at *5; *Abad v. Bayer Corp.*, 563 F.3d 663, 667 (7th Cir. 2009).  As the Supreme Court instructs, when foreign plaintiffs bring suit in the U.S., their choice of forum cannot be presumed to be based on convenience.  *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007); *Piper Aircraft*, 454 U.S. at 256.  In weighing the private and public interest factors, there is "no reason to place a thumb on the scale" in favor of Plaintiffs' choice of this forum.  *Abad*, 563 F.3d at 667; *see also Clerides,* 534 F.3d at 628.

### A.    Indonesia Is an Available and Adequate Alternative Forum.

The first step in the FNC analysis is to determine whether an adequate alternative forum is available.  *Kamel*, 108 F.3d at 802.  Courts have consistently held that Indonesia is an available and adequate alternative forum for personal injury and wrongful death cases.  *See, e.g.*, *Zipfel v. Halliburton Co.*, 832 F.2d 1477, 1484-85 (9th Cir. 1987), *amended on other grounds*, 861 F.2d 565 (9th Cir. 1988); *Gonzales v. P.T. Pelangi Niagra Mitra Int'l*, 196 F. Supp. 2d 482, 486-89 (S.D. Tex. 2002); *Carney v. Singapore Airlines*, 940 F. Supp. 1496, 1499-1501 (D. Ariz. 1996).  There is no reason to reach a different conclusion here.

Indeed, there can be no dispute that Indonesia is an adequate and available forum for this type of claim.  Multiple plaintiffs are currently pursuing wrongful death actions in Indonesia against Boeing and another U.S. manufacturer arising out of the 2005 crash of Mandala Airlines Flight 91 in Medan, Indonesia.  Several of the actions have proceeded to trials.  (Kendrick ¶ 15;

-10-

Ganie ¶¶ 72-75.) Thus Indonesia is a demonstrably available and adequate forum for the resolution of wrongful death claims arising out of an Indonesian air crash.

Indonesia's adequacy and availability is further confirmed by the declaration of Defendants' Indonesian law expert, Mohamed Idwan Ganie. Dr. Ganie is a lecturer in law at the University of Indonesia, and has a law degree from the University of Indonesia and a Ph.D. in commercial law from the State University of Hamburg, Germany. He has published in the field of Indonesian civil law and practices regularly in the Indonesian courts. His qualifications and opinions are explained in more detail below and in his declaration, in which he unequivocally explains that Indonesia is an available and adequate forum for these cases.

### 1. Indonesia Is an Available Forum.

A forum is available when all parties are amenable to process and within the forum's jurisdiction. *Kamel*, 108 F.3d at 803. A defendant's agreement to consent to jurisdiction establishes a foreign forum's availability. *See In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 484 F.3d 951, 957 (7th Cir. 2007) ("*Factor II*"); *Kamel*, 108 F.3d at 803. Defendants here agree to consent to jurisdiction in Indonesia as a condition of dismissal. If a defendant appears in a case filed in Indonesia and files no exception or objection to jurisdiction, "[a]n Indonesian court must accept the U.S. Defendants' consent to jurisdiction." (Ganie ¶¶ 34-35.) Thus Defendants' stipulation to consent to jurisdiction alone establishes Indonesia's availability. *See Factor II*, 484 F.3d at 957; *Kamel*, 108 F.3d at 803.[10]

### 2. Indonesia Is an Adequate Forum.

"An alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly." *Kamel*, 108 F.3d at 803. Indonesia easily satisfies this low threshold requirement. Plaintiffs will not be deprived of "all" remedies in Indonesia. The Indonesian Civil Code provides victims a cause of action for "unlawful acts." (Ganie ¶ 68.) Economic and noneconomic damages are available to the legal heirs of a decedent as defined by Indonesian law. (Ganie ¶ 71.) Thus, as to any claims that are not otherwise barred by the Releases, Ganie

---

[10] Not only is Indonesia an available forum, but for the majority of Plaintiffs, it is a mandatory forum for claims relating to the Releases. This weighs heavily in favor of dismissal. *See Wong v. Partygaming Ltd.*, 589 F.3d 821, 833 (6th Cir. 2009); *Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1358 (1st Cir. 1992).

states that "if the plaintiffs are able to meet the burden of proof [under Indonesian law] and are able to prove that the Defendant in the United States had committed illegal acts causing the Flight 574 incident, then the plaintiffs can and will obtain indemnification in the Indonesian Court under the laws of the Republic of Indonesia." (Ganie ¶ 94.) Because Indonesia provides Plaintiffs "some potential avenue for redress," it is an adequate forum. *Kamel*, 108 F.3d at 803 (internal quotation marks and citation omitted); *see also Piper Aircraft*, 454 U.S. at 254 & n.22.

Further, Indonesia's judicial system contains sufficient procedural safeguards to assure its adequacy. The Indonesian judicial system is a civil law system based on the European model. (Ganie ¶ 15.) Plaintiffs would have easy access to Indonesian counsel and many admit they have already retained Indonesian counsel in connection with decedents' deaths. (Ganie ¶¶ 18-19; Kendrick ¶ 9.) Upon payment of minimal filing fees, plaintiffs could proceed in an Indonesian District Court. (Ganie ¶ 39.) The cases would be decided by a panel of three judges who must be qualified, trained, and approved by the President of Indonesia upon the recommendation of the Chief Justice of the Supreme Court. (Ganie ¶ 27.) Indonesian procedural rules provide for the collection of evidence (both documentary and testimonial) from parties and Indonesian third parties, as well as for the presentation of such evidence (including expert testimony) in court for examination by the judges and opposing counsel. (Ganie ¶¶ 53, 63-66.) Two levels of appeals are available. (Ganie ¶¶ 24, 62.) That the procedures of the Indonesian courts differ from those in the U.S. does not make the forum inadequate. *See Hull 753 Corp. v. Elbe Flugzeugwerke GmbH*, 58 F. Supp. 2d 925, 929 (N.D. Ill. 1999) (citing *Mercier*, 981 F.2d at 1352-53.)

As the standard for adequacy is "easily met," *In re Air Crash Near Athens, Greece on August 14, 2005*, 479 F. Supp. 2d 792, 797 (N.D. Ill. 2007) ("*Athens*"), *aff'd sub nom. Clerides*, 534 F.3d 623 (7th Cir. 2008), this is not one of those "rare" situations in which the alternative forum may be deemed inadequate. *See PT United Can v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998) ("At this stage, considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards, so such a finding is rare."). Dr. Ganie's declaration underscores that not only is Indonesia an adequate forum for this litigation, it is the preferable forum. This litigation would

-12-

be followed closely by the Indonesian press and public, and the high profile of this litigation would facilitate an "efficient, fair and appropriate" resolution of these claims.  (Ganie ¶ 91.).

**B.      The Private Interest Factors Strongly Favor Dismissal.**

The private interest factors include the relative ease of access to sources of proof, availability of compulsory process for attendance of unwilling witnesses, the cost of obtaining attendance of willing witnesses, and "'all other practical problems that make trial of a case easy, expeditious and inexpensive.'"  *Piper Aircraft*, 454 U.S. at 241 n.6 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)); *see also Clerides*, 534 F.3d at 628.  In determining what evidence or witnesses are relevant, the court looks to the claims and defenses pled by the parties. *Id.* at 629.  The private interest factors at issue here weigh strongly in favor of FNC dismissal.

**1.      The Location of Sources of Proof Factor Favors Indonesia.**

The majority of evidence relating to liability, damages, and the Releases is located in Indonesia.  All decedents in this case were killed when an aircraft maintained and operated by an Indonesian air carrier crashed in Indonesian waters during a scheduled flight between two Indonesian cities.  Most of these Plaintiffs received compensation pursuant to settlements reached in Indonesia and executed Releases there that on their faces relieve Defendants from liability.  Plainly, documents in Indonesia and the testimony of Indonesian witnesses will be of critical significance to this case.

**a.      Critical Liability Evidence is in Indonesia.**

It is evident from the face of Plaintiffs' consolidated amended complaint that significant liability evidence relevant to their own negligent entrustment, negligence, and product liability claims is located in Indonesia.  For example:

- Plaintiffs allege that "Adam Air did not have properly trained pilots and crew."  (*See, e.g.*, Dkt. No. 32, Count IX ¶ 42.)  In order to evaluate this claim, evidence regarding the competency of the pilots and crew as well as the training they received over the course of their careers is critical.  This would include, for example, all the crew's personnel files, training records, performance evaluations, and licensing records.  It would also include witnesses with knowledge of the crew's training, performance, licensing, and flying skills.  This evidence is in Indonesia in the possession of Adam Air and its former employees and the Indonesian DGCA that issued the pilots' licenses and had oversight responsibility for Adam Air's training.  Significantly, the Captain of the Accident aircraft

-13-

joined Adam Air merely six months before the Accident. Thus, much of the evidence regarding his training and performance is likely in the possession of the Indonesian airline for whom he previously worked. (Dodt Ex. A at 9-10.)

- Plaintiffs allege that Adam Air "did not have properly qualified and trained maintenance personnel." (*See, e.g.*, Dkt. No. 32, Count IX ¶ 42.) Documents and witnesses regarding the competency and training that Adam Air's maintenance personnel received over the course of their careers are critical to evaluate this claim. Again, this evidence is in Indonesia in the possession of Adam Air and its former employees as well as the DGCA, which had oversight responsibility for the airline. (Dodt Ex. A at 36.)

- Plaintiffs allege that Adam Air "did not have an adequate maintenance program." (*See, e.g.*, Dkt. No. 32, Count IX ¶ 42.) Documents and witnesses regarding the substance of Adam Air's maintenance program are in Indonesia where the airline operated and where the DGCA had oversight and approved Adam Air's maintenance program. (Dodt Ex. A at 15.)

- Plaintiffs allege that the aircraft "had numerous repetitive problems relating to the aircraft's Inertial Reference System" for three months before the Accident and that these problems were not fixed. (*See, e.g.*, Dkt. No. 32, General Allegations ¶¶ 27, 30.) Documents and testimony regarding the nature of these problems, the steps taken to fix them, and the identity of the maintenance organization that attempted to fix them are located in Indonesia where Adam Air operated. In addition, less than a month before the Accident, the DGCA issued a Certificate of Airworthiness for the Accident aircraft subject to certain corrective actions. (Dodt Ex. A at 36.) Documents and testimony regarding the DGCA's inspection of the aircraft, conclusions regarding its condition, and oversight of Adam Air's response are relevant to this allegation and all are located in Indonesia. (Dodt Ex. A at 15.)

- Plaintiffs also allege that Adam Air manuals did not have the latest revisions published by Boeing and did not include training material on the Inertial Reference System. (*See, e.g.*, Dkt. No. 32, General Allegations ¶¶ 31, 32.) Evidence regarding whether Adam Air obtained up-to-date manuals and which manuals were provided to the pilots is located in Indonesia. Likewise, evidence regarding the full scope of training provided by Adam Air on the IRS is also located in Indonesia. (Dodt Ex. at 10-11.)

As shown above, Plaintiffs' own pleading includes questions regarding the sufficiency of the oversight by the DGCA and Adam Air of the maintenance of the aircraft, the quality of Adam Air's operations, and the competency and training of the Adam Air pilots. The documents and witnesses relevant to these substantial questions are located in Indonesia where the aircraft was maintained, inspected, and operated, where the pilots and crew were trained and did their jobs, and where the Indonesian DGCA performed its oversight of the airline. The location of this

-14-

evidence in Indonesia weighs heavily in favor of dismissal.  *See Clerides,* 534 F.3d at 629 (affirming *Athens,* 479 F. Supp. 2d at 800) (evidence relating to flight crew, airline, and regulatory oversight); *Baumgart v. Fairchild Aircraft Corp,* 981 F.2d 824, 836 (5th Cir. 1993) (maintenance, operational, hiring and training records of airline); *Fredriksson,* 2009 WL 2952225, at *6 (aircraft maintenance records and operator's former staff); *Da Rocha,* 451 F. Supp. 2d at 1323-24 (aircraft logbooks, pilot training records, and air traffic control documents and witnesses).

Other important liability evidence is also located in Indonesia in the possession of the KNKT.  Even though most of the airplane wreckage was not recovered from the ocean floor, the KNKT investigators gathered information, assembled and reviewed records, interviewed witnesses, and examined the available data from the CVR and DFDR.  All this evidence is relevant to determining the cause of the Accident and whether any alleged defects in this aircraft caused this Accident.  The entire set of evidence collected by the KNKT during its investigation can only be found in Indonesia.  (Dodt ¶¶ 5-7, 14, 16-19.)  Courts have recognized that this type of evidence is critical in aircraft accident litigation and that its location in the foreign forum favors FNC dismissal.  *See Tazoe v. Aereas,* No. 07-21941-CIV, 2009 WL 3232908, at *4 (S.D. Fla. Aug. 24, 2009); *Melgares,* 613 F. Supp. 2d at 242; *Van Schijndel,* 434 F. Supp. 2d at 777; *Athens,* 479 F. Supp. 2d at 800; *see also Lampitt v. Beech Aircraft Corp.,* No. 81 C 5406, 1982 U.S. Dist. LEXIS 12677, at *10 (N.D. Ill. May 4, 1982) (Aspen, J.) (Kendrick Ex. Y.)

   **b.    Damages Evidence is in Indonesia.**

All 52 decedents, all 32 Plaintiffs and all of the 105 wrongful death beneficiaries identified so far are Indonesian nationals, and all but two beneficiaries reside in Indonesia. (Kendrick ¶¶ 7-8.)[11]  Plaintiffs' FNC discovery responses confirm that their damages evidence is located overwhelmingly in Indonesia.  The evidence includes the documents and witnesses necessary to evaluate the claimed economic losses (like the testimony of employers and accountants, and documents such as tax returns, bank records, pay stubs, employment records,

---

[11] The two beneficiaries who reside outside of Indonesia (one in the U.S. and one in Australia), (Kendrick ¶ 8) appear to be adult siblings of an adult decedent and therefore not proper legal beneficiaries under either Indonesian law (Ganie ¶ 70) or U.S. law.  *See* 46 U.S.C. § 30302 (Death on the High Seas Act).

-15-

and medical records regarding life expectancy), as well as the claimed non-economic losses (like the testimony of family, friends, and others with knowledge of the relationships between decedents and beneficiaries).  (*See, e.g.*, Dkt. No. 32 ¶ 42.)

Courts have consistently held that ease of access to sources of damages proof in a foreign plaintiff's or decedent's home forum weighs heavily for dismissal.  *See In re Bridgestone/ Firestone, Inc.*, 420 F.3d at 705 (where "[plaintiff's] medical, employment, vehicle, and tax records are in Mexico, as is evidence of the family's pain and suffering," this factor favors the Mexican forum); *Lueck*, 236 F.3d at 1146 (granting FNC dismissal where evidence located abroad was "crucial to the damages portion of this suit"); *Athens*, 479 F. Supp. 2d at 800; *see also Taiwan Straits*, 331 F. Supp. 2d at 1196 ("substantial" damages evidence in Taiwan weighs in favor of FNC dismissal).  The number of Plaintiffs and wrongful death beneficiaries and the voluminous damages evidence located in the foreign forum, standing alone, makes the overall access to evidence greater in Indonesia.

Bringing this evidence to the U.S., by contrast, will pose numerous "practical problems" that an FNC dismissal will avoid.  *Piper Aircraft*, 454 U.S. at 241 n.6.  This is best shown by the difficulties that the majority of Plaintiffs have had responding to the most basic preliminary discovery.  In limited discovery requests, Boeing sought information about, for example, Plaintiffs' residency and citizenship and that of their decedents, the identity of beneficiaries who claim damages, the location of damages evidence, and the existence of claims made in Indonesia. (Kendrick ¶¶ 5, 8, 13 & Exs. C-D.)  Nine Plaintiffs have not served responses at all.  Those who did respond required at least two court-approved extensions, and then provided incomplete, inconsistent, or late information.[12]  (Kendrick ¶¶ 5, 8, 13.)  These difficulties will only increase if the actions remain here and more detailed interrogatories and document requests are propounded.

These practical problems will undoubtedly multiply given the sheer number of beneficiaries, not to mention other relevant witnesses, located in Indonesia.  It is, in fact, likely that the evidence of hundreds of witnesses and documents must be obtained from Indonesia,

---

[12] Indeed, two different law firms provided discovery responses on behalf of, and purported to represent, the same plaintiff, and those discovery responses were inconsistent with each other.  (Kendrick ¶ 14.)

presented in Bahasa Indonesian, and translated into English for this Court, with accompanying delay, cost, and potential for mistakes.  *See Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund*, 589 F.3d 417, 425 (7th Cir. 2009) (affirming FNC dismissal where "most of the discovery in this case will take place in Bulgaria, and transporting all of the evidence and witnesses to Chicago would be unnecessarily expensive").  Avoiding these predictable difficulties in obtaining discovery weighs in favor of dismissal.  *See Athens*, 479 F. Supp. 2d at 800 n.6.

### c.   Evidence Related to the Releases is in Indonesia.

A majority of Plaintiffs have released and/or assigned to Adam Air their claims against Defendants and therefore relinquished any standing they have to bring these claims.  Each Plaintiff who previously signed a Release now "intend[s]" to argue that it was procured through duress and unconscionable conduct "based on a lack of counsel present when the releases were allegedly obtained" and a "lack of negotiation in allegedly obtaining the releases." (Kendrick Ex. O at 2-3.)  Based on the affirmations in the Releases regarding their reliability and propriety, there is no basis to believe that the Releases were obtained or executed improperly.  But assuming Plaintiffs proceed with these claims, the witnesses and evidence that Plaintiffs need to prove (and that Defendants need to rebut) them is in Indonesia.  This includes documents relating to the settlement negotiations, execution of the Releases, and tender and acceptance of funds.  It would also include witnesses like the Releasors themselves, Adam Air's representatives who negotiated the Releases and paid the settlement funds, notaries who verified Releasors' signatures and explained the terms of the Releases, and other witnesses to the Releases.  None of this evidence is in the U.S.  Under virtually identical circumstances, where plaintiffs were alleging that releases executed in Taiwan were fraudulently induced, the Seventh Circuit recently affirmed an FNC dismissal, finding that:

> Evidence beyond the language of the settlement agreement will be necessary to disambiguate the [disputed] clause, ***and it seems that most of the persons who are in a position to give such evidence live in Taiwan***—the plaintiffs' Taiwanese counsel who negotiated the settlement, a Taiwanese patient representative, members of the Taiwanese department of health, defendant's Taiwanese outside counsel, and an employee of defendants in Taiwan—while only two live in the United States.

*Chang*, 2010 WL 1136521, at *4 (emphasis added).  Because all necessary sources of proof on

-17-

this likely dispositive issue in these cases are in Indonesia, and none are in the U.S., this factor strongly favors dismissal. *See id.*; *see also Damigos v. Flanders Compania Naviera S.A.-Panama*, 716 F. Supp. 104, 107-08 (S.D.N.Y. 1989).

### 2. Critical Witnesses and Documents Are Beyond the Reach of Compulsory Process.

The Supreme Court and the Seventh Circuit have recognized the importance of choosing a forum where unwilling witnesses can be compelled to appear and testify. *Gulf Oil,* 330 U.S. at 511; *Clerides*, 534 F.3d at 629-30. Where Plaintiffs themselves have stated that it would be "unwieldy and burdensome" (Kendrick Ex. X) to travel from their homes in Indonesia to Chicago in connection with this litigation, it is likely that third parties will also refuse to travel to the U.S. to participate in these cases.[13] Thus, critical evidence relating to the Releases, damages, and liability will remain beyond this Court's compulsory process. *Carney*, 940 F. Supp. at 1502-03.

This Court's lack of compulsory process will deprive Defendants of crucial evidence regarding the Releases and damages that is outside Plaintiffs' control. *See Damigos*, 716 F. Supp. at 107-08 (inability to compel attendance of Greek witnesses to negotiation and execution of releases in Greece "weighs strongly" in favor of FNC); *In re Factor VIII or IX Concentrate Blood Products Litigation*, 531 F. Supp. 2d 957, 975 (N.D. Ill. 2008) ("*Factor III*") (access to damages witnesses weighed in favor of FNC); *aff'd sub nom. Abad*, 563 F.3d 663. It will also deprive Defendants of essential liability evidence which is in the control of Adam Air and its employees, the KNKT, and the DGCA. Because a full and fair hearing on all issues cannot be had in the U.S. without the evidence located in Indonesia, this factor strongly favors dismissal. *Van Schijndel*, 434 F. Supp. 2d at 779 ("[I]t is not fair to make U.S. manufacturers proceed to trial without foreign witnesses who cannot be compelled to attend.").

Moreover, Indonesia is not a party to the Hague Evidence Convention or any other similar treaty and Indonesian courts are unlikely to honor any request for judicial assistance to

---

[13] Even if third-party witnesses in Indonesia were willing to travel to the U.S. to testify, the substantial cost of doing so would still favor dismissal. *See Paolicelli v. Ford Motor Co.*, 289 F. App'x 387, 390 (11th Cir. 2008); *Navarrete De Pedrero*, 635 F. Supp. 2d at 263; *Da Rocha*, 451 F. Supp. at 1324.

-18-

compel evidence in Indonesia for use in the U.S. (Ganie ¶ 67.) Defendants could attempt to obtain Indonesian evidence in Indonesia through letters rogatory, but no Indonesian law facilitates their execution. (*Id.*) Many such requests would be needed to obtain all the relevant evidence located in Indonesia, and Indonesian enforcement of numerous letters rogatory is highly doubtful, and would be inefficient at best. (*Id.*); *Chang*, 2010 WL 1136521, at *5 ("sending a letter rogatory to the foreign court seems not to be a very satisfactory means of obtaining evidence from Taiwan") (citation and punctuation omitted); *see also Quaak v. KPMG Bedrijfsrevisoren*, 361 F.3d 11, 21 & n.4 (1st Cir. 2004) (obtaining evidence through letters rogatory is "burdensome, costly, and time-consuming," and less certain than under the Hague Convention); *Tazoe*, 2009 WL 3232908, at *6; *Da Rocha*, 451 F. Supp. 2d at 1325. Even if letters rogatory could be enforced, the superiority of live testimony and the inconvenience of obtaining evidence through such a process favors dismissal. *Gulf Oil*, 220 U.S. at 511; *Clerides*, 534 F.3d at 629-30; *Chhawchharia v. Boeing Co.*, 657 F. Supp. 1157, 1161 (S.D.N.Y. 1982).

If these cases were re-filed in Indonesia, however, the Indonesian courts have procedures that would allow them to compel production of this third-party evidence. (Ganie ¶¶ 63-66.) The presence of Defendants' evidence in the U.S., by contrast, does not favor this forum because Plaintiffs will also have access to Defendants' evidence in an Indonesian action. Witnesses and documents within Defendants' control will be subject to the same compulsory process of the Indonesian court. (Ganie ¶ 64); *Alexander Proudfoot, Plc v. Fed. Ins. Co.*, 860 F. Supp. 541, 545 (N.D. Ill. 1994); *see also Van Schijndel*, 434 F. Supp. 2d at 776. Moreover, all Defendants agree as a condition of dismissal to produce any evidence and employees that is determined to be relevant by an Indonesian court. (Kendrick ¶ 35; Honeywell ¶ 5; World Star ¶ 3; Wells Fargo & Co. ¶ 3; Wells Fargo Bank ¶ 3; TAL ¶ 3; TABS ¶ 3.) "[B]ecause th[is] district court cannot compel production of much of the [foreign] evidence, whereas the parties control, and therefore can bring, all the United States evidence to [the foreign forum], the private interest factors weigh in favor of dismissal." *Lueck*, 236 F.3d at 1147; *see also Clerides*, 534 F.3d at 629; *Gambra*, 377 F. Supp. 2d at 819**.**

-19-

3.     **The Inability to Join Adam Air in the U.S. Favors Dismissal.**

It is well established that "the inability to join third parties is a substantial private interest factor weighing in favor of dismissal." *Factor III*, 531 F. Supp. 2d at 973; *see also Piper Aircraft*, 454 U.S. at 259 (holding that foreign forum is more convenient because "[j]oinder of the pilot's estate, [and foreign companies] is crucial to the presentation of petitioner's defense"). Both Boeing and Honeywell assert in their Answers that Adam Air and its employees were the proximate cause of the Accident. Likewise, Plaintiffs' own negligent entrustment claim asserts that Adam Air's allegedly improperly trained flight and maintenance crews played a major role in causing the Accident. But if these cases proceed in the U.S., it will do so without Adam Air, as it appears that Adam Air lacks the requisite jurisdictional "minimum contacts" with the U.S. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-75 (1985).

By contrast, if these cases were re-filed in Indonesia, the Plaintiffs whose claims are not barred by Releases could initiate suit directly against Adam Air as a defendant. (*See* Ganie ¶¶ 44-45.) To the extent that Releases bar Plaintiffs' claims against Adam Air, they can still join Adam Air as a "co-defendant." A co-defendant in Indonesia is a party that is joined even though no monetary judgment may be sought. A co-defendant is obliged to participate in the lawsuit, provide evidence, and acknowledge and obey any court order. (Ganie ¶¶ 43; 63-66.) Joining Adam Air as a co-defendant would therefore ensure its participation in litigation regarding the Releases that it obtained and the airplane that it operated and maintained. It would also ensure that Adam Air's evidence was available on both the release and liability issues. (*Id.* ¶ 43.) That Adam Air is bankrupt and no longer an operating airline does not prevent it from being sued in Indonesia either as a regular defendant or as a co-defendant. (Ganie ¶¶ 45-46.)

Even if Plaintiffs chose not to sue Adam Air in Indonesia, any Defendant could file an application with the Indonesian court to join Adam Air either as a defendant or co-defendant because of the "close connection" between Adam Air and the issues in the case. (Ganie ¶¶ 42, 44.) Dismissal is therefore also warranted to ensure that the actions can be re-filed in Indonesia where all possible tortfeasors and all parties to the Releases may be brought before the same court. If the litigation remains here, on the other hand, Defendants may be prejudiced in their ability to fully and fairly defend this case. *Factor II*, 484 F.3d at 958; *Van Schijndel*, 434 F.

-20-

Supp. 2d at 780; *Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 161 (S.D.N.Y. 2004).

**C.    The Public Interest Factors Also Strongly Favor Dismissal.**

The public interest factors include the local interest in having localized controversies decided at home, the unfairness of burdening citizens in an unrelated forum with jury duty, administrative difficulties related to court congestion, and the avoidance of problems in conflicts of law or in application of foreign law.  *Gulf Oil*, 330 U.S. at 508-09; *Kamel*, 108 F.3d at 803. The public interest factors here also weigh heavily in favor of dismissal.

**1.    Indonesia Has an Overwhelming Interest in Deciding This Dispute, Far Outweighing the Interest of Any Possible U.S. Forum.**

There can be no dispute that Indonesia has an overwhelming interest in this case.  As a preliminary matter, Indonesia has a strong interest in whether the Releases, which were negotiated and executed in Indonesia by Indonesian parties, and that on their face extinguish claims arising out of an Indonesian air crash, are valid and enforceable.  *Chhawchharia*, 657 F. Supp. at 1161 (recognizing "India's interest in determining the validity and effect of the release"); *see also Damigos*, 716 F. Supp. at 109.

Indonesia's interest is even greater due to the nature of the underlying dispute.  The heart of this case centers around an aircraft operated by an Indonesian airline and regulated by Indonesian authorities that crashed on a domestic flight killing Indonesian residents.  These facts establish Indonesia's strong interest in the litigation.  (Ganie ¶ 82.)  *See Piper Aircraft*, 454 U.S. at 260; *Clerides*, 534 F.3d at 630; *In re Air Crash Near Peixoto De Azeveda, Brazil, on September 29, 2006,* 574 F. Supp. 2d 272, 288-89 (E.D.N.Y. 2009), *aff'd sub nom. Lleras,* 2009 WL 4282112 (2d Cir. Dec. 2, 2009); *Esheva*, 499 F. Supp. 2d at 500; *Taiwan Straits*, 331 F. Supp. 2d at 1204.  As courts have recognized, Indonesia has a "great" interest in "ensuring that the heirs and beneficiaries of the majority of those on [the flight] are compensated and treated fairly." *Gambra*, 377 F. Supp. 2d at 825.  It also has a significant interest in "regulating the use of allegedly defective products within [its] borders" and "in protecting the health and safety of [its] residents."  *Clerides*, 534 F.3d at 630; *see also Bridgestone/Firestone*, 420 F.3d at 705.

The initiatives taken by the Indonesian government in the wake of the Accident

-21-

underscore Indonesia's compelling interest in this controversy.  These initiatives include the creation and work of the EKKT; the safety audit and ranking of all Indonesian airlines; and the execution of a joint agreement with ICAO to improve Indonesian civil aviation safety.  (Ganie ¶¶ 84-85, 87; Kendrick Ex. H..)  *See Clerides*, 534 F.3d at 630 (foreign countries' "demonstrated interest" shown through criminal and official investigations into the crash).  A foreign government's interest in a regulated industry, like airline operations, is "particularly strong."  *In re Factor VIII or IX Concentrate Blood Prods. Liab. Litig.*, 408 F. Supp. 2d 569, 589 (N.D. Ill. 2006) ("*Factor I*"), *aff'd* 484 F.3d 951 (7th Cir. 2007).  Given the Indonesian government's intense focus on civil aviation safety, the importance of air travel to the economy of Indonesia, and the media and public attention that the Accident received, this litigation would be followed by the Indonesian public and press were it refiled in Indonesia.  (Ganie ¶ 91.)  These considerations weigh heavily for dismissal.  *See In re Air Crash Near Peixoto De Azeveda*, 574 F. Supp. 2d at 288-89; *Esheva*, 499 F. Supp. 2d at 500); *see also Gulf Oil*, 330 U.S. at 509 ("In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only.").

No U.S. forum has an interest in this litigation that even approaches the interest of Indonesia, let alone surpasses it.  Illinois, where the majority of these cases would be tried, has no meaningful relationship to this action and has demonstrated no interest in this litigation.  Boeing's commercial aircraft operations are not located in Illinois and none of its relevant documents or witnesses are located there.  (Dodt ¶¶ 21-23.)  None of the other Defendants has relevant documents or witnesses in Illinois.  (Honeywell ¶ 4; Wells Fargo & Co. ¶ 4; Wells Fargo Bank ¶ 4; World Star ¶ 4; TABS ¶ 4; TAL ¶ 4.)[14]  The fact that Boeing moved its corporate headquarters to Chicago long after it sold the Accident aircraft does not give this forum an overriding interest in the litigation.  The Seventh Circuit confirmed this in *Clerides*, finding that the Northern District of Illinois has "no local connection" to foreign air crash

---

[14]  That Boeing manufactured the aircraft in Washington state or that Honeywell manufactured the avionics components that were delivered with the aircraft in Minnesota does not give Washington or Minnesota, let alone Illinois or California, any substantial interest in this litigation that outweighs Indonesia's interest. *Van Schijndel*, 434 F. Supp. 2d at 784; *Taiwan Straits*, 331 F. Supp. 2d at 1203.

-22-

litigation against Boeing brought by foreign plaintiffs. 534 F.3d at 630; *see also Kamel*, 108 F.3d at 805 (affirming FNC dismissal of defendant sued in principal place of business, noting that Illinois has no more than a "mere passing" interest in the action); *Factor III*, 531 F. Supp. 2d at 978 (headquarters and manufacturing facility in forum was not "in any way comparable to the interests of" Argentina, where injuries occurred).

California, where only 9 of the claims were filed, has a similarly slight interest. Although World Star is alleged to have its principal place of business in California, it did not lease, maintain or operate the aircraft anywhere, and certainly not in California. (Dkt. No. 42-1 ¶¶ 17-27, Dkt. 47 at ¶ 33).[15]  In *Gambra*, the court found that California's interest, as the location of the aircraft lessor, in wrongful death litigation was "minimal" where "[a] substantial portion of defendants' evidence regarding liability [wa]s located outside of California" and plaintiffs were not "third party beneficiaries of the lease." 377 F. Supp. 2d at 825.  Given Indonesia's strong and present interest in these cases, the passing interests of Illinois and California are hardly sufficient to tip the public interest factors away from dismissal.

Even if the Court were to consider the interests of the U.S. as a whole, any generalized interest in ensuring the safety of U.S.-made or owned aircraft cannot outweigh Indonesia's substantial interest in this litigation. *See Athens*, 479 F. Supp. 2d at 804.  This conclusion is squarely supported by the U.S. Supreme Court's decision in *Piper Aircraft*.  In that case, the Supreme Court approved FNC dismissal of a case against Piper Aircraft, even though the case was pending in Pennsylvania, where Piper Aircraft had its headquarters, manufacturing facilities, and evidence.  In doing so, the Supreme Court conclusively rejected the notion that that U.S. forum's interests either matched the foreign forum's interests or pointed away from dismissal. To the contrary, the Supreme Court unequivocally stated that "[t]he American interest in this

---

[15] Triton Aviation Limited is a Bermuda corporation and did not lease, maintain or operate the aircraft and does not have any documents or employees with knowledge pertaining to the operation or maintenance of the subject aircraft by Adam Air.  (TAL ¶ 4.)  Wells Fargo Bank Northwest, N.A., a national banking association that acted solely in its capacity as owner-trustee for the subject aircraft, has its principal office in Ogden, Utah and has only limited transactional documents related to its status as owner-trustee of the subject aircraft, does not have any documents or employees with knowledge pertaining to the operation or maintenance of the subject aircraft by Adam Air or any other entity.  (Wells Fargo Bank ¶ 4.)

accident *is simply not sufficient* to justify the enormous commitment of judicial time and resources that would inevitably be required if the case were to be tried here." *Piper Aircraft,* 454 U.S. at 261 (emphasis added). Since *Piper Aircraft*, "courts have repeatedly exercised their discretion to hold that a defendant's manufacturing activities within the U.S. do not tilt the public interest in favor of retaining jurisdiction where overseas events are the primary catalyst for litigation initiated by foreign plaintiffs." *In re Air Crash Near Peixoto De Azeveda*, 574 F. Supp. 2d at 288; *see also Macedo v. Boeing Co.*, 693 F.2d 683, 686 (7th Cir. 1982) ("The fact that the aircraft was manufactured in the [U.S.] does not make the accident, involving a Portuguese airline, an airport in Portugal, predominantly Portuguese plaintiffs and Portuguese witnesses, any less a matter of local Portuguese interest.").

> **2.     There Is No Reason to Burden Any U.S. Court with Resolving Litigation in Which Indonesia Has Such a Significant and Overwhelming Interest.**

Maintaining these actions in any U.S. forum would create a significant burden. Courts in both Illinois and California would have to determine the enforceability of each of the Releases; delve into complex issues relating to an Indonesian airline's flight operations, maintenance, and training; and sift through translated damages evidence relating to 52 Indonesian decedents and more than 100 of their Indonesian beneficiaries. (Kendrick ¶ 8.) The complexity of these cases ensures that trials will consume a significant amount of court and litigant time and resources. *See Baumgart v. Fairchild Aircraft Corp.*, No. 90-818, 1991 WL 487242, at *7 (W.D. Tex. Sept. 30, 1991) (trials involving 19 foreign plaintiffs would take a substantial amount of time to try and public interest factors favored dismissal even though aircraft designed, manufactured, and tested in Texas), *aff'd*, 981 F.2d 824 (5th Cir. 1993); *Nolan v. Boeing Co.*, 762 F. Supp. 680, 684 (E.D. La. 1989) ("no justification" for retaining jurisdiction when trials arising from foreign aviation accident involving 100 plaintiffs "could be expected to last months"), *aff'd*, 919 F.2d 1058 (5th Cir. 1990); *cf. Factor I*, 408 F. Supp. 2d at 588 (individual trials in hemophiliac/HIV cases would "require many months of court time"); *see also Factor III*, 531 F. Supp. 2d at 979. This heavy burden is not justified by the, at most, slight interest each forum has in the litigation. *See Lueck*, 236 F.3d at 1147; *Athens*, 479 F. Supp. 2d at 804.

-24-

### 3. These Cases Would Proceed to Trial Nearly Three Times Faster in Indonesia Than in the U.S.

Most civil cases in Indonesia are required to be resolved in the trial court within six months. (Ganie ¶ 61.)  Indeed, the first trials arising out of the Mandala Flight 91 litigation were resolved in the Central Jakarta District Court within nine months of the first hearing. (Kendrick ¶ 15; Ganie ¶ 73.)  In contrast, the median time to trial is 27.8 months in the Northern District of Illinois and 24.5 months in the Northern District of California – nearly three times longer than in Indonesia. (Kendrick Ex. G.)  The substantially shorter time to trial in Indonesia further supports dismissal. *In re Factor II*, 484 F.3d at 958-59.

### 4. Dismissal Would Avoid Unnecessary Conflict of Laws Problems and the Necessity of Applying Indonesian Law.

The FNC doctrine "is designed in part to help courts avoid conducting complex exercises in comparative law." *Piper Aircraft*, 454 U.S. at 251; *Athens*, 479 F. Supp. 2d at 804-05 *see also Martin v. Vogler*, No. 93 C 3870, 1993 WL 462853, at *4 (N.D. Ill. Nov. 9, 1993) (Aspen, J.). Cases arising from foreign aircraft accidents inevitably "pose complex choice of law issues." *Athens*, 479 F. Supp. 2d at 804; *see also In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001*, No. MDL 1448, 2006 WL 1288298, at *4 (S.D.N.Y. May 9, 2006).  Because retention of this action would require the Court to "'untangle problems in conflict of laws, and in law foreign to itself,'" this public interest factor, like all the other factors, "point[s] towards dismissal." *Piper Aircraft*, 454 U.S. at 251 (quoting *Gulf Oil*, 330 U.S. at 509).

First, if the Court were to address any questions regarding the Releases' validity, it would have to "untangle" Indonesian law, which must apply to those issues by virtue of the Releases' choice-of-law clause. (Ganie ¶ 80.)  This strongly favors dismissal. *See Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 665 (9th Cir. 2009); *Geier v. Omniglow Corp.*, No. 08-4032, 2009 WL 4893668, at *2 n.3 (2d Cir. Dec. 21, 2009); *see also Damigos*, 716 F. Supp. at 108 n.5 (FNC granted where Greek law likely to apply to releases).

Second, to the extent the Releases do not bar certain claims, when addressing liability and damages issues, a court would also be required to engage in the type of complex choice-of-law analysis that FNC is designed to avoid.  Because the Accident occurred on the high seas over

-25-

Makassar Strait, Sulawesi, Indonesia, a U.S. court would apply the multi-factor *Lauritzen* admiralty choice-of-law test to determine whether to apply the U.S. Death on the High Seas Act ("DOHSA") or Indonesian law.  *See, e.g., Fredriksson*, 2009 WL 2952225, at *16 & n.29 (citing *Lauritzen v. Larsen*, 345 U.S. 571 (1953)); *In re Air Crash Disaster Near Bombay, India on Jan. 1, 1978*, 531 F. Supp. 1175, 1184-91 (W.D. Wash. 1982).[16]

This Court need not conduct a full choice of law analysis to grant FNC dismissal.  *See Athens*, 479 F. Supp. 2d at 805 ("the Court need not definitively resolve the issue of which forum's law will apply" where other factors already point to dismissal).  But the *Lauritzen* analysis, which requires a court to balance various factors in this air crash case that point squarely to Indonesia, including the law of the aircraft's flag or registry, the operator's domicile, the injured party's domicile, the place of ticketing, and the place of the wrongful act, may indeed result in the application of Indonesian law to liability and damages issues.  *See, e.g., Fredriksson*, 2009 WL 2952225, at *15-17.

Here, the likelihood that the Court will have to apply the unfamiliar tenets of Indonesian civil law to some or all of the issues in this case "tip[s] the scales in favor of dismissal." *Stroitelstvo Bulgaria Ltd.*, 598 F. Supp. 2d at 889 (citing *Kamel*, 108 F.3d at 805); *see Satz*, 244 F.3d at 1284 (dismissal favored where "there is a possibility that the district court would have to apply Argentine law to decide this case"); *Fredriksson*, 2009 WL 2952225, at *16 (likelihood that foreign law applies "weighs against retention of the action").

## IV.    CONCLUSION

Indonesia is by far the more convenient and appropriate forum to determine the validity of the Releases, liability for the Accident, and the extent of Plaintiffs' damages.  Because an Indonesian forum would "best serve[] the convenience of the parties and the ends of justice,"

---

[16] If U.S. law applies, that law is DOHSA, which preempts any state law wrongful death and survival claims for accidents that occurred on the high seas beyond three nautical miles from the shore of the U.S. *In re Air Crash Disaster Near Peggy's Cove, Nova Scotia on Sept. 2, 1998*, 210 F. Supp. 2d 570, 586 (E.D. Pa. 2002).  A choice of law analysis is required because there are conflicts between DOHSA and Indonesian law.  *Compare* 46 U.S.C. § 30302 (identity of beneficiaries) *with* Ganie ¶ 70; *compare Dalrymple v. Fairchild Aircraft Inc.*, 575 F. Supp. 2d 790, 796 (S.D. Tex. 2008) (standard of liability), *with* Ganie ¶ 69; *compare* 46 U.S.C. § 30307(b) (items of recoverable damages) *with* Ganie ¶ 71.

*Clerides,* 534 F.3d at 628, Defendants respectfully request that these actions be dismissed on the basis of *forum non conveniens* in favor of Indonesia.

Dated:  April 5, 2010                                 Respectfully submitted,

By: /s/ Bates McIntyre Larson                   By: /s/ Gary W. Westerberg

William T. Cahill                                Gary W. Westerberg
Bates McIntyre Larson                            Christopher R. Barth
Charles W. Mulaney                               Matthew J. Kalas
PERKINS COIE LLP                                 LOCKE LORD BISSELL & LIDDELL LLP
131 S. Dearborn Street, Suite 1700               111 S. Wacker Dr.
Chicago, Illinois  60603-5559                    Chicago, IL 60606-4410
Tel.: (312) 324-8400                             Tel.: (312) 443-0700
Fax: (312) 324-9400                              Fax: (312) 443-0336

Allison R. Kendrick                              ***Wells Fargo & Company; Wells Fargo***
PERKINS COIE LLP                                 ***Bank Northwest, N.A.,( incorrectly sued in***
1201 Third Avenue, Suite 4800                    ***its individual capacity and not in its***
Seattle, WA  98101-3099                          ***capacity solely as owner-trustee); World***
Tel.:  (206) 359-8000                            ***Star Aviation Services, Inc. (incorrectly***
Fax:  (206) 359-9000                             ***sued as World Star Aviation Services, Ltd.);***
                                                 ***Triton Aviation Business Services Holdings,***
***Counsel for Defendant***                      ***LLC; and Triton Aviation Ltd. (incorrectly***
***The Boeing Company***                         ***sued as Triton Aviation, Ltd. d/b/a Triton***
                                                 ***Aviation Ireland, Ltd.)***

By: /s/ Mark S. Susina

Michael G. McQuillen
Mark S. Susina
Austin W. Bartlett
ADLER MURPHY & MCQUILLEN LLP
One North La Salle Street, Suite 2300
Chicago, IL 60602
Tel.: (312) 345-0700
Fax: (312) 345-9860

***Counsel for Defendant***
***Honeywell International Inc.***

-27-

## CERTIFICATE OF SERVICE

I, Bates McIntyre Larson, certify that on April 5, 2010, I caused the foregoing **DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS ON THE GROUNDS OF *FORUM NON CONVENIENS*** to be filed via CM/ECF, which will send notification of such filing to the counsel of record listed below:

*Attorneys for Plaintiffs (Case No. 09 CV 549)*

Floyd A. Wisner
Email: faw@wisner-law.com
Wisner Law Firm
3N 780 Trotter Lane
St. Charles, Illinois 60175
Tel.: (630) 513-9434

*Attorneys for Plaintiffs (Case No. 09 CV 556)*

Joseph A. Power, Jr.
Email: joepower@prslaw.com
Brian LaCien
Email: blacien@prslaw.com
Carolyn Daley Scott
Power Rogers & Smith, PC
Three First National Plaza
70 West Madison, 55th Floor
Chicago, Illinois 60602
Phone: (312) 236-9381

*Attorneys for Plaintiffs (Case No. 09 CV 3815)*

Christopher Welling Graul
Email: cwg2004@netscape.com
150 North Michigan Avenue
Suite 2800
Chicago, IL 60601
Tel.: (312) 794-7300

Tomas Augustine Ramirez
Email: tramirez66@gmail.com
William S. Moylan
Email: wmoylan@hotmail.com
Ribbeck Law Chartered
505 N. Lake Shore Drive
Chicago, IL 60611
Tel.: (312) 822-9999

*Attorneys for Wells Fargo & Company; Wells Fargo Bank Northwest, N.A.,( incorrectly sued in its individual capacity and not in its capacity solely as owner-trustee); World Star Aviation Services, Inc. (incorrectly sued as World Star Aviation Services, Ltd.); Triton Aviation Investments, LLC; Triton Aviation Services Business Holdings, LLC; and Triton Aviation Ltd. (incorrectly sued as Triton Aviation, Ltd. d/b/a Triton Aviation Ireland, Ltd.)*

Gary W. Westerberg
Email: gwesterberg@lockelord.com
Christopher R. Barth
Email: cbarth@lockelord.com
Matthew J. Kalas
Email: mkalas@lockelord.com
LOCKE LORD BISSELL & LIDDELL LLP
111 S. Wacker Dr.
Chicago, Illinois 60606-4410
Tel.: (312) 443-0700

*Attorneys for Defendant Honeywell International Inc.*

Michael G. McQuillen
E-mail: mmcquillen@amm-law.com
Mark S. Susina
Email: msusina@amm-law.com
Austin W. Bartlett
E-mail: abartlett@amm-law.com
ADLER MURPHY & MCQUILLEN LLP
Chicago, Illinois 60602
Tel.: (312) 345-0700

_/s/ Bates McIntyre Larson_
One of the attorneys for Defendant The Boeing Company